**D. B. SCHULL, Appellant,**

v.

**LOWER NECHES VALLEY AUTHORITY,**
**Appellee.**

**No. 6908.**

Court of Civil Appeals of Texas.

Beaumont.

June 1, 1967.

Rehearing Denied June 28, 1967.

Adams & Browne, Beaumont, for appellant.

Weller, Wheelus & Green, Beaumont, for appellee.

PARKER, Associate Justice.

Summary judgment was entered that plaintiff Schull take nothing against defendant Lower Neches Valley Authority. Schull sued Lower Neches Valley Authority for $20,250.00 damages for the destruc-

tion of barges and logs owned by plaintiff destroyed as a direct result of the Authority's having constructed a salt water barrier dam across Pine Island Bayou, a navigable stream, causing waters to flood and destroy said personal property belonging to Schull. Schull has appealed. The parties will be designated as in the trial court.

Plaintiff contends it was error to grant defendant's motion for summary judgment because his damage was the direct result of the intentional act of a governmental body engaged in the performance of a public work and, thus, comes directly under Art. 1, Sec. 17 of the Texas Constitution, Vernon's Ann.St. Plaintiff next contends it was error to grant defendant's motion for summary judgment because plaintiff's loss was not the result of an unprecedented rainfall as that term has been defined by the courts of this state.

Lower Neches Valley Authority is a governmental agency as set out in Art. 8280, Sec. 103, Subdivision 13(c). Lower Neches Valley Authority was organized for the purposes of constructing, maintaining and operating in the valleys of the Neches River and its tributaries any and all works deemed essential to the operation of the district in the control, storing, preservation and distribution to all useful purposes of the waters of the Neches River and its tributary streams. It preserves fresh water and sells it to surrounding municipalities, industries and local farmers.

The undisputed facts of the case relating to these two arguments are stated below.

Pine Island Bayou is a tributary of the Neches River. The Bayou is 600 feet wide where it flows into the Neches. Since the deepening of the ship channel to 36 feet from Beaumont to the Gulf of Mexico over 30 years ago, salt water from the Gulf goes up the Neches and up Pine Island Bayou as far as Voth. The Bayou is subject to tide. On Pine Island Bayou some two or three miles due west of the Neches but five or six miles from the Neches following the Bayou meanders Lower Neches Valley Authority has a pumping plant. The bank there is 3½ feet above mean low tide. Downstream from, but near this pumping plant, Lower Neches Valley Authority in the early summer of 1963 constructed a salt water barrier of steel piling before Hurricane Cindy occurred. The top of this barrier was 3½ feet above mean low tide. The Bayou at that point is 160–180 feet wide. Above and below such point the Bayou is crooked and winding. Its width as places below the barrier is as little as 60 feet. Lower Neches Valley Authority constructed the salt water barrier dam of steel piling to an elevation of 3½ feet above mean low tide of the Gulf of Mexico to prevent salt water from the Gulf flowing upstream from the dam. In August of 1963 salt water was at this point. Ordinarily, a like barrier was installed in the Bayou each year in May or June. The general area to the north and east of such barrier and plant was very low. The area to the north to Village Creek was known as the "Big Swamp".

About five miles westward from the barrier, Highway 69 crosses Pine Island Bayou. Downstream from Highway 69 about ½ mile the Santa Fe has a bridge across the Bayou. Plaintiff's home was located upstream from the dam about five miles, near Voth, on a knoll 150 to 175 feet from the Bayou. Near his house plaintiff had some homemade float barges built of timber and gasoline drums. The barges in the vicinity of his house were tied with ⅝" rope around a tree, with a five foot leaway on the rope. Also upstream from the dam were other barges tied with ⅝" rope to a tree or trees, the ropes being four to five feet in length. On the bank upstream plaintiff had logs he had unloaded, pulled up against his land and secured to a tree by a chain. For several years prior to 1963 plaintiff had been engaged in the business of salvaging sunken logs out of Pine Island Bayou.

*Pine Island Bayou* drains an area north of Liberty back towards Hull and Daisetta and over into the Sour Lake area. Its tributaries drain north and east of Sour Lake, taking in a large part of Hardin and Liberty counties. The Bayou also drains a large area of Jefferson County and the Willow Creek area out of Liberty County.

On September 17, 1963, Hurricane Cindy hit this Pine Island Bayou area. Heavy flooding ensued from torrential rains which averaged 15 to 20″ throughout the Sabine-Neches area with locally higher amounts in northern Orange and extreme southern Newton counties. Area streams were unable to accommodate the excessive rainfall. The area flood damages were estimated very nearly 12 million dollars. The above data in this paragraph is from the U.S. Department of Weather Bureau "Local Climatogical Data".

Plaintiff had been in this area over 20 years. From the very beginning of this hurricane, water rose 2′ and 3″ an hour. At Voth the water rose to 14.6′ above mean low tide and was almost to the top of Highway 69 bridge. He testified:

"Q. And you didn't know Cindy was going to produce that much water, did you?

A. Well, I don't think you people did either, I will just answer that."

"A. Well we have had several rises on the bayou since the time I have been out there and I have never seen one come and go like that storm Cindy did in there, and I have seen them come and rise and get awful high, but I have never seen them come up that quick and take everything with it."

During the storm there was not any difference in the level of the water below the barricade as compared to above the barricade. The water at an elevation of over 3½ feet went over and around the barricade, flooding the surrounding low area.

During the storm the water was spread in all directions over the countryside.

As to the flooding, plaintiff did not know the exact hour it started but when the storm and rain hit there was a tremendous head of water coming from upstream from his home. The water rose fast all day and by late evening it reached its peak around 14 feet. Plaintiff made no attempt to retie or loosen the lines on his barges. It was too dangerous. When the water reached its height during the storm the ropes securing the barges either had to break or the barges had to sink. Plaintiff testified that the ropes were either broken or gone after the storm. He didn't know whether they broke loose after the water reached an elevation of 12 or 14 feet or before. The logs chained to a tree were gone after the storm. Plaintiff didn't know whether the chain broke or what happened, as he never did find the chain. He testified:

"You can put it the chain come loose if you want to. The chain might have come loose, I don't know, but the wall of water coming down the bayou at the rate it come will move anything."

"Q. Do you know when this timber broke loose?

A. No, sir, I don't. It broke loose during the storm. After the water receded it wasn't there.

Q. All right, but you don't know what time of day or night that these barges broke loose or that the timber broke loose?

A. No, sir, I don't, because I wouldn't get out and see, I am not taking my life in my hands to go down a wall of water."

"Q. You sure didn't, all of this could have broken loose in the height of the storm after it raised up to 12 or 14 feet in height?

A. I am not saying it could or it couldn't, I don't know, I wasn't there."

Schull also testified in his deposition the water was over 14 feet or more up in his yard during the storm; that the 4th or 5th day after the storm and the water had receded he went up the highway bridge where one man's boat was completely horseshoed around one of the columns of the bridge, bent tightly around it, "we had a tremendous stress of water coming down at the time", referring to September 17th and the storm.

 Under Rule 166–A summary judgment is authorized only when it is shown there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law. The test is whether or not a fact issue to be decided by the court or jury is raised, and if so, no summary judgment should be entered and trial on the merits should be had. Subdivision (e) of Rule 166–A provides:

"(e) Form of Affidavits; Further Testimony. Supporting and opposing affidavits shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein. Sworn or certified copies of all papers or parts thereof referred to in an affidavit shall be attached thereto or served therewith. The court may permit affidavits to be supplemented or opposed by depositions or by further affidavits."

In Gulf, Colorado & Santa Fe Railway Co. v. McBride, 322 S.W.2d 492 (1958), the Supreme Court stated:

"When motion for summary judgment is supported by affidavits, depositions, stipulations or other extrinsic evidence sufficient on its face to establish facts, which, if proven at trial, would entitle movant to an instructed verdict, opponent must show opposing evidentiary data which will raise an issue as to a material fact or must justify his inability to do so and seek appropriate relief under Rule

subdivision. Rules of Civil Procedure, rule 166–A(f).

"Where plaintiff moves for summary judgment in an action in which defendant has pleaded an affirmative defense, he is entitled to have his summary judgment, if he demonstrates by evidence that there is no material factual issues upon elements of his claim, unless his opponent comes forward with a showing that there is such a disputed fact issue upon affirmative defense."

In the affidavit of D. B. Schull attached to and made a part of plaintiff's reply to defendant's motion for summary judgment he states that he makes the affidavit of his own personal knowledge. In one paragraph, he states:

"I actually went to the scene of the barrier erected by LNVA and saw the water backed up Pine Island Bayou and it was running over said barrier for a height of approximately seven (7) feet. The water level in the Neches River at that time was approximately ten (10) feet lower than the water in Pine Island Bayou. At the point of confluence of Pine Island and the Neches River the river is approximately six hundred (600') feet wide and thirty (30') feet deep and the water level was approximately ten (10') feet lower than the water running over the barrier erected by Lower Neches Valley Authority. The Neches River could have easily absorbed the full head of water coming down Pine Island Bayou and it would hardly have been noticed in the Neches River."

This affidavit does not state when Schull went to the barrier or when he inspected the Neches River. By deposition Schull stated time and again that he did not get out during the storm. He did not see the water above and below the salt water barrier during the hurricane. It was not until the 4th day after the storm that Schull and his son got in a boat at his home place and went down to the dam where the water was

still running 5 or 6 feet over this barrier, boiling over the swamp. The swamp extended from Village Creek to the north to the pumping plant where the barrier was erected. Nor did Schull see the Neches River during the storm. It is undisputed that Pine Island Bayou enters the Neches River some 2 or 3 miles east of the barrier and five or six miles above the river by the meanders of the bayou. Some 3 days after the storm and not before, Schull went by automobile to the Beaumont Country Club on the Neches River, below the mouth of Pine Island Bayou where the water, according to him, was normal. The Beaumont Country Club is not on Pine Island Bayou or near the salt water barrier. The supporting and opposing affidavit of Schull was not made on personal knowledge of the conditions above and immediately below the barrier at a time material to the issues involved and would not have been admissible in evidence upon a trial. The statements in the opposing affidavit and deposition of Schull fail to raise a genuine fact issue as to a material fact, to-wit: that the destruction and damage to Schull's property was a direct result of the barrier being constructed by Lower Neches Valley Authority. The conclusions contained in Schull's affidavit and deposition would not have been admissible in a trial on the merits. Legal conclusions in affidavit opposing summary judgment will not be considered by the reviewing court. Rosas v. Doreen (Tex.Civ.App.1966) 402 S.W.2d 813, n. w. h.; Toban v. Garcia, 159 Tex. 58, 316 S.W. 2d 396 (S.Ct.1958); Harang v. Aetna Life Ins. Co., 400 S.W.2d 810 (err. ref., n. r. e.); Keahey v. Dallas Teachers Credit Union, 374 S.W.2d 450, n. w. h., and opinions cited at p. 452. Legal conclusions are insufficient to create a fact issue, there being evidence on the material facts in affidavits and depositions. Dillon v. Greenville Hospital Authority, 404 S.W.2d 956 (Tex.Civ. App.1966).

■ Plaintiff did not know when or how the barges and timber broke loose and were destroyed or damaged during Hurricane Cindy. Unless material to an issue in the case, an issue of fact would not preclude rendering of summary judgment. Shaw v. Frank, 334 S.W.2d 476 (Tex.Civ.App. 1959); Baxter v. Beaupre, 295 S.W.2d 718 (Tex.Civ.App.1956).

Under the material undisputed facts plaintiff has failed to show that the construction of the salt water dam was the proximate cause of the damages to his personal property. Plaintiff has failed to show that his damage was the direct result of the building of the salt water dam.

■ Taking into consideration the area drained by Pine Island Bayou, the fact that the level of the water above and below the salt water dam during the storm was the same, the known fact that water seeks its level, the fact that such salt water dam at this location had never caused flooding of such a nature as occurred during Cindy, and the fact that the velocity of the wall of water coming down the bayou from above plaintiff's house carrying everything before it, supports the conclusion that there was an unprecedented rainfall in the entire area drained by Pine Island Bayou. The further fact that this was a hurricane supports the proposition that this was an "act of God". For these reasons, the defendant was not liable for plaintiff's damages to his barges and logs. Walker v. Texas Mexican Railway Co., 27 S.W.2d 574, 578; Hunt Bros. v. Missouri, K & T Railway Co., 74 S.W. 69; Benavides v. Gonzalez, 396 S.W. 2d 512 (Tex.Civ.App.1965).

Such points of error asserted by plaintiff are each overruled. Such being true, the other points of error are immaterial and are not passed upon.

Judgment of the trial court is affirmed.